UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JOHN SALVAGNE, et al.,          :     NO: 1:09-CV-00324
                                :
          Plaintiffs,           :
                                :     **OPINION AND ORDER**
             v.                 :
                                :
FAIRFIELD FORD, INC.,           :
                                :
          Defendant.            :


          This matter is before the Court on Defendant's Motion for

Summary Judgment (doc. 54) and Plaintiffs' Motion for Summary

Judgment (doc. 63), together with the respective responses and

replies (docs. 72, 73, 74 and 75).  The Court heard arguments on

the motions on August 5, 2010, and, for the following reasons, the

Court DENIES Defendant's motion in part, GRANTS it in part, DENIES

Plaintiffs' Motion in part and GRANTS it in part.

**I.  Background**

          This matter arises out of Named Plaintiffs' purchase of

a used car from Defendant Fairfield Ford ("Defendant" or "Ford").

On June 1, 2008, Named Plaintiffs visited Defendant's car lot and

entered into a transaction to buy a 2006 Chevy Impala (doc. 1).

The transaction involved Named Plaintiffs signing more than a dozen

purchase, finance and related forms, including a credit

application, a buyer's order, odometer disclosure forms, insurance

forms, trade-in forms, a retail installment contract (the "RISC"),

and a "Limited Right to Cancel-Purchase" (the "Spot Delivery

Agreement") (<u>Id</u>.). The two documents relevant to this action are the RISC and the Spot Delivery Agreement.

The RISC expressly identified Named Plaintiffs as the "Buyer (and Co-Buyer)" and Ford as the "Creditor-Seller," and by signing the RISC, the Buyer agreed to buy the car "under the agreements on the front and back of this contract" and agreed to pay the "Creditor-Seller...the Amount Financed and Finance Charge...below" (<u>Id</u>.). "Below," the RISC set forth the following financial terms of the sale in a section titled "Federal Truth-in-Lending Disclosures": Annual Percentage Rate ("APR") 8.28%; Finance Charge $5000.03; Amount Financed $17,318.47; Total of Payments and Total Sale Price $22,321.50; with 75 monthly payments (<u>Id</u>.).

In addition, the RISC contained a section titled, in all caps, "NO COOLING OFF PERIOD," which explained that "[s]tate law does not provide for a 'cooling off' or cancellation period for this sale. After you [Named Plaintiffs] sign this contract, you may only cancel it if the seller agrees or for legal cause. You cannot cancel this contract simply because you change your mind..." (<u>Id</u>.). Below this section, in smaller font, the RISC contained a section titled, in all caps, "HOW THIS CONTRACT CAN BE CHANGED," which read in relevant part, "This contract contains the entire agreement between you and us relating to this contract. Any change to this contract must be in writing and we must sign it. No oral changes are binding" (<u>Id</u>.). That section also read, "See back for

2

other important agreements" (Id.).  Under that section, in larger font just above the signature lines, the RISC read, "You agree to the terms of this contract.  You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it.  You confirm that you received a completely filled-in copy when you signed it" (doc. 54).  Just below the signature lines, the contract read, in the smaller font, "Seller assigns its interest in this contract to JP Morgan Chase Bank, N.A."  The back of the RISC included, among other things, a section titled "Finance Charge and Payments," which contained a statement that "We," which by the terms of the front of the RISC meant Ford, "will figure the Finance Charge on a daily basis at the [APR] on the unpaid part of the Amount Financed" as well as statements regarding how "we" will apply payments (doc. 1).  In addition, the back of the RISC, in a section titled "Your other promises to us," contained a statement noting that Named Plaintiffs gave Ford a security interest in the car and related property and detailing the repercussions of Named Plaintiffs defaulting on the contract (Id.).

The parties also signed the Spot Delivery Agreement, a separate document, as part of the transaction (Id.).  That agreement read in relevant part,

> You understand that it may take a few days for us to verify your credit and to obtain financing directly from the third party lender whose loan documents we have had you sign (the "Lender") or, if you signed a [RISC] with us, to assign the [RISC] to a third party financial institution.  You agree that we have 10 days to obtain financing from the Lender or to

> assign the [RISC] to any one of the financial institutions
> with whom we regularly do business, within this period of
> time, you or we may cancel the sale of the Vehicle.  If the
> sale is canceled, the Lender's loan documents or the [RISC]
> you have signed will be null and void and of no effect (<u>Id</u>.).

The Spot Delivery Agreement further provided that Ford would notify Named Plaintiffs if Ford could not "obtain financing from the Lender or assign the [RISC]" and, upon that notice, Named Plaintiffs were required to "comply with 'Buyer's Obligations' described below" and Ford was required to return "all consideration" received (<u>Id</u>.).  The "Buyer's Obligations" included returning the car immediately and in the same condition as it was when it was sold (<u>Id</u>.).  In addition, the Spot Delivery Agreement provided that "[n]othing...gives you the right to cancel the sale or the Lender's loan documents or the [RISC] you have signed for reasons unrelated to our inability to obtain financing from the Lender or assign the RISC" (<u>Id</u>.).  Finally, the Spot Delivery Agreement provided that its terms "are hereby incorporated by reference into and made a part of any...[RISC] between you and us for the purchase of the Vehicle" (<u>Id</u>.).

Named Plaintiffs questioned the need to sign the Spot Delivery Agreement, saying that it made them question the RISC they had just signed.  In response, Named Plaintiffs contend that the Ford representative said it was something they made everyone sign, and it was "just a legal form."  Named Plaintiffs signed the balance of the forms, including the Spot Delivery Agreement, which

completed the transaction. After spending over eight hours at the dealership, Named Plaintiffs then left with the Impala, leaving their Durango behind as a trade-in (<u>Id</u>.).

The Ford detail shop was closed the day Named Plaintiffs purchased the car, so they returned two days later to have it cleaned and filled with gas, as instructed by Ford (<u>Id</u>.). When Named Plaintiffs returned that day they were told that Ford had made some errors when Named Plaintiffs purchased the car and Named Plaintiffs, in order to keep the car, would need to sign new financing paperwork, including a new RISC (<u>Id</u>.). This new RISC ("RISC 2") contained terms that were more adverse to Named Plaintiffs and made the sale more expensive (<u>Id</u>.). Specifically, RISC 2 listed an APR of 9.79%, a finance charge of $6771.89, a total of payments and total sale price of $24,090.36, with 84 monthly payments (doc. 54). Named Plaintiffs nonetheless signed RISC 2, which was backdated to June 1, 2008, and kept the Impala (doc. 1).

Named Plaintiffs allege for themselves and the class members that the TILA disclosures contained in RISC 1 were not meaningful and the contract rendered illusory because the Spot Delivery Agreement gave Ford the opportunity to rescind that contract. Additionally, Named Plaintiffs argue that the very signing of the Spot Delivery Agreement violates TILA because the Spot Delivery Agreement indicates that a third party is extending

5

credit to the consumer, which, according to Plaintiffs, is not true because Ford is the actual creditor.  In addition, Named Plaintiffs assert for themselves and on behalf of the class that (i) if Ford was actually unable to assign RISC 1, and it could only assign the paper under terms more harsh to Plaintiffs, then Ford was required by the Equal Credit Opportunity Act ("ECOA") to give Plaintiffs notice of an adverse credit action, which Ford did not do; and (ii) Ford's procedures are deceptive, unfair and/or unconscionable in violation of Ohio's Consumer Sales Practices Act ("OCSPA") (Id.).

The Court certified this matter as a class action on December 15, 2009, with the following classes:

1.   All persons who have signed a RISC prepared by Defendant and whose signatures were also obtained by Defendant on a Spot Delivery Agreement or similar document purporting to give Defendant the ability to revoke the RISC under certain circumstances since May 9, 2008 (the "TILA Class");

     Subclass 1.   Persons who belong to the TILA Class who were subsequently contacted by the Defendant and required to sign a new RISC with different terms and conditions since May 9, 2008.

2.   All persons who have signed a RISC prepared by Defendant and whose signatures were also obtained by Defendant on a Spot Delivery Agreement or similar document purporting to give Defendant the ability to revoke the RISC under certain circumstances who were not provided a written adverse action notice by Defendant pursuant to 15 U.S.C. §1691, et seq., and/or Regulation B since May 9, 2007 (the "ECOA Class"); and

3.   All persons who have signed a RISC prepared by Defendant and whose signatures were also obtained by Defendant on a Spot Delivery Agreement or similar document purporting to give Defendant the ability to revoke the RISC under

certain circumstances since May 9, 2007 (the "Ohio Class") (doc. 36).

Ford moved for summary judgment on all claims, as did Plaintiffs (docs. 54 and 63). All responses and replies have been filed, and the motions are ripe for the Court's consideration.

## II.   Summary Judgment

A grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; see also, e.g., Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464 (1962); LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir. 1993); Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs., 979 F.2d 1131, 1133 (6th Cir. 1992) (per curiam). In reviewing the instant motion, "this Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Fatton v. Bearden, 8 F.3d. 343, 346 (6th Cir. 1993), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 251-252 (1986) (internal quotation marks omitted).

The process of moving for and evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and non-movant are well settled. First, "a party seeking

summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact [.]" Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also LaPointe, 8 F.3d at 378; Garino v. Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1982); Street v. J.C.D. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989). The movant may do so by merely identifying that the non-moving party lacks evidence to support an essential element of its case. See Barnhart v. Pickrel, Shaeffer & Ebeling Co. L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the non-movant, after completion of sufficient discovery, must submit evidence in support of any material element of a claim or defense at issue in the motion on which it would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. See Celotex, 477 U.S. at 317; Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). As the "requirement [of the Rule] is that there be no genuine issue of material fact," an "alleged factual dispute between the parties" as to some ancillary matter "will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-248 (emphasis added); see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989). Furthermore, "[t]he mere

8

existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252; see also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir. 1994). Accordingly, the non-movant must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 339-340 (6th Cir. 1993); see also Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405.

Although the non-movant need not cite specific page numbers of the record in support of its claims or defenses, "the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies." Guarino, 980 F.2d at 405, quoting Inter-Royal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) (internal quotation marks omitted). In contrast, mere conclusory allegations are patently insufficient to defeat a motion for summary judgment. See McDonald v. Union Camp Corp., 898 F.2d 1155, 1162 (6th Cir. 1990). The Court must view all submitted evidence, facts, and reasonable inferences in a light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); United States v. Diebold, Inc.,

9

369 U.S. 654 (1962).  Furthermore, the district court may not weigh evidence or assess the credibility of witnesses in deciding the motion.  See Adams v. Metiva, 31 F.3d 375, 378 (6th Cir. 1994).

Ultimately, the movant bears the burden of demonstrating that no material facts are in dispute.  See Matsushita, 475 U.S. at 587.  The fact that the non-moving party fails to respond to the motion does not lessen the burden on either the moving party or the court to demonstrate that summary judgment is appropriate.  See Guarino, 980 F.2d at 410; Carver v. Bunch, 946 F.2d 451, 454–455 (6th Cir. 1991).

## III. DISCUSSION AND ANALYSIS

### A.    Truth in Lending Act

Congress enacted TILA in 1968 with the general purpose "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit."  15 U.S.C. § 1601(a); Baker v. Sunny Chevrolet, Inc., 349 F.3d 862, 864 (6th Cir. 2003).  The statute must be construed liberally in the consumer's favor.  Baker, 349 F.3d at 864.  The sections of TILA at issue here are 15 U.S.C. § 1638, which requires creditors to make certain disclosures to consumers in certain forms and under certain time frames, and 15 U.S.C. §1640(a), which outlines the cause of action and damages available for violations of TILA.  In addition,

10

Plaintiffs rely on TILA's implementing regulation 12 C.F.R. § 226.1, et seq. ("Regulation Z"), which prescribes the form and manner in which creditors must disclose the TILA-required information. Specifically, Regulation Z provides in relevant part that "[t]he creditor shall make the disclosures required by [TILA] clearly and conspicuously in writing, in a form that the consumer may keep" and that such disclosures must be made "before the consummation of the transaction." 12 C.F.R. § 226.17(a), (b). "Consummation" is defined as "the time that a consumer becomes contractually obligated on a credit transaction." 12 C.F.R. § 226.2(a)(13).

Here, the parties do not dispute that the disclosures made in the RISC satisfy TILA's requirements for content. Instead, the dispute is whether the Spot Delivery Agreement renders those disclosures meaningless. Plaintiffs argue that the transaction was consummated when they signed RISC 1 and that the change in terms effected by RISC 2 renders the disclosures made in RISC 1 meaningless and illusory. Defendant argues that the terms in RISC 1 were not illusory because Plaintiffs were bound by the terms of RISC 1 until RISC 1 was cancelled by Defendant. Then, Plaintiffs were bound by the terms of RISC 2, a separate contract. Defendant's position is that a RISC, when merged with the Spot Delivery Agreement, creates a contract subject to a condition

11

subsequent: if financing is secured or the RISC assigned, then the contract is binding on both parties; if not, either party may cancel, and the contract is void. A contract subject to a condition subsequent, Defendant contends, is perfectly permissible under TILA (doc. 54, citing, inter alia, Janikowski v. Lynch Ford, Inc., 210 F.3d 765 (7th Cir. 2000); Lequillou v. Lynch Ford, 2000 WL 198796 (N.D. Ill. 2000); Chastain v. N.S.S. Acquisition Corp., 2009 WL 1971621 (S.D. Fla. 2009)).

The Court has reviewed the cases to which Defendant cites and is not persuaded by them.[1] Instead, the Court finds persuasive the reasoning of the court in Patton v. Jeff Wyler Eastgate, Inc., 608 F.Supp.2d 907 (S.D. Ohio 2007). In Patton, the plaintiffs put forth arguments similar to those present here, that the TILA disclosures in the installment contract they signed were rendered illusory by the spot delivery agreement they signed at the same time. 608 F.Supp.2d at 914. The Patton court noted that the

---

[1] Indeed, the Court notes that the installment contract and conditional sales document at issue in Chastain were significantly different from the ones present here. For example, the Chastain RISC itself contained a section that notified the consumer that the deal was conditioned on the seller's ability to assign the contract on the exact terms shown and that it could, if unable to do so, cancel the contract. Chastain, 2009 WL 1971621 at * 1. Also, the buyer's order at issue contained an explicit "Notice of Conditional Sales Agreement," which clearly noted that the deal would not become final and the consumer would not own the car until a third-party lender approved the loan. Id. at *2.

installment contract at issue was a "fully integrated contract that by its own terms was binding upon the parties...at the time it was signed" and that nothing in the installment contact made it contingent on approval or assignment to a third party. Id. at 914-15.  In contrast, the spot delivery agreement in Patton allowed the dealership to undo the contract and reclaim the car if the contract was not assigned or financing was not approved by a third party. Id. at 915.  In essence, the Patton court found that the installment contract and the spot delivery agreement contradicted each other, and the cancellation right in the spot delivery agreement rendered the disclosures made in the installment contract meaningless. Id.

        Here, the RISC, like the installment contract in Patton, is, standing alone, a fully integrated contract that by its terms was binding upon Plaintiffs when they signed it.  The RISC contains absolutely no language alerting anyone to the fact that it is in actuality contingent on the performance of some third party.  On the contrary, all indications in the RISC support a conclusion that it was a completed contract and that Plaintiffs, upon signing it, were bound by its terms.  For example, the RISC explicitly states that after the Plaintiffs "sign this contract, [they] may only cancel it if the seller agrees or for legal cause."  Indeed, the RISC clearly reads, "This contract contains the entire agreement between you and us relating to this contract," and "Seller assigns

13

its interest in this contract to JP Morgan Chase Bank, N.A."  In addition, the RISC contains a statement noting that Plaintiffs gave Ford a security interest in the car and related property and detailing the repercussions of Plaintiffs defaulting on the terms of the RISC.  These statements in the aggregate give the unmistakable and indisputable impression that the RISC was a fully integrated contract, binding upon Plaintiffs.

The Spot Delivery Agreement, however, comes along and purports to impose a condition subsequent on the RISC, already a fully integrated, binding contract.  Despite the fact that the Spot Delivery Agreement is a document not referenced by or alluded to or incorporated by the RISC in any conceivable interpretation of the RISC, Defendant asks this Court to find that the Spot Delivery Agreement and the RISC together form one contract by virtue of the RISC's merger clause and an incorporation statement found in the Spot Delivery Agreement.  For additional support for its positions, Defendant reminds the Court of Ohio's general rule that "a court may construe multiple documents together if they concern the same transaction." Center Ridge Ganley, Inc. v. Stinn, 31 Ohio St.3d 310, 314, 511 N.E.2d 106 (1987); see also Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth., 78 Ohio St.3d 353, 361-362, 678 N.E.2d 519 (1997) (stating that "a writing, or writings executed as part of the same transaction, will be read as a whole, and the intent of each part will be gathered

14

from a consideration of the whole.").

While the Court appreciates Ohio's general contract interpretation rule, here, just as in <u>Patton</u>, "[s]pecial circumstances militate against" its application. <u>See</u> <u>Patton</u>, 608 F.Supp.2d at 915. First, as described above, the RISC contains a merger clause, which notes that the RISC "contains the entire agreement" between the parties. Defendant argued at the hearing that reading this statement in context, however, supports its position because the next statement on the RISC describes how the contract can be changed: by a written statement signed by Ford. Because the Spot Delivery Agreement was a writing signed by Ford, Defendant argues, it was an effective modification of the RISC. The Court is entirely unpersuaded by this argument. Indeed, the statement that the RISC may only be changed by a written statement signed by Ford in no way puts the consumer on notice that, in actuality, the RISC is <u>not</u> the "entire agreement" between the parties. Instead, that statement is merely a standard contractual provision prohibiting oral modifications; it certainly cannot be construed as an alert to the consumer that the sales contract they have signed, which contains all of the material terms to the transaction they have spent hours negotiating, the contract upon which the entire transaction is based, did not actually seal the deal. Therefore, reading the "entire agreement" statement in its full context, including the statement prohibiting oral

15

modifications, does not change the Court's finding that the RISC was a fully integrated contract. At the hearing before the Court, counsel for Defendant expressed frustration with the Court's questions regarding Defendant's position that the two documents were merged into one contract and asked, "How could Ford have merged them? Stapled them together?" Clearly, making the documents physically touch would not solve the defects here. Instead, the point is that the RISC itself must, in some meaningful and unequivocal way, alert the consumer that the deal is not final and binding on either party until a lender has agreed to finance the transaction, and, therefore, the terms on the RISC should not be construed as the final terms of the deal. In short, if Ford wishes to impose a condition subsequent on its deals, the RISC must clearly reach out and incorporate the Spot Delivery Agreement, not the other way around.

Indeed, given that the RISC and the Spot Delivery Agreement contradict each other in material ways, the Court cannot see how they could be read as one contract. For example, the RISC explicitly provides that, "Seller assigns its interest in this contract to JP Morgan Chase Bank, N.A." In contrast, the Spot Delivery Agreement purports to give Ford ten days to assign the contract. The RISC clearly and unequivocally identifies Ford as the "Creditor-Seller," notes that Ford "will figure the Finance Charge on a daily basis at the [APR] on the unpaid part of the

16

Amount Financed," describes how Ford will apply payments received by Plaintiffs, and, through the RISC, Plaintiffs purport to give Ford a security interest in the car. In contrast, the Spot Delivery Agreement purports to condition the deal on financing being provided by an un-named third party who, presumably, will actually be the one to "figure the Finance Charge" and receive and apply payments and who will, presumably, take a security interest in the car. Finally, the RISC contains a noticeable alert to consumers that after they sign the contract, they cannot change their mind and cancel the contract for any reason other than for "legal cause" or if Ford agrees. In contrast, the Spot Delivery Agreement purports to give both consumers and Ford the option to cancel the contract, but only if Ford is unable to secure financing. As in <u>Patton</u>, the material inconsistencies between the RISC and the Spot Delivery Agreement "make it impossible to reconcile the two contractual documents and read them as a coherent single contract." <u>Patton</u>, 608 F.Supp.2d at 915.

Finally, the Court finds that the use of the Spot Delivery Agreement to impose a condition subsequent on the deal as outlined in the RISC violates the purpose of TILA because consumers cannot, under this arrangement, ever meaningfully compare credit offers since they cannot know what the actual offer is. In other words, the RISC, standing alone, in no way conditions the sale on financing. On the contrary, it expressly binds the consumer to the

17

purchase of the car on the terms disclosed.  The Spot Delivery Agreement, on the other hand, if seen to "modify" the RISC, modifies it by completely undermining it and conditioning the sale on financing.  With one hand, the dealership goes through all of the machinations of creating a binding sales contract: securing personal information from the consumer in order to conduct a credit check and to ascertain what terms would be acceptable to the consumer, shopping the package around in a process that can take hours until the moment when the representative emerges from the back room saying, "We have a deal," then having the consumer sign the RISC with the terms from the "deal."  But with the other hand, the dealership undoes that deal with the Spot Delivery Agreement. TILA was expressly designed to promote the informed use of credit by ensuring that creditors make meaningful disclosures of the terms upon which they will extend credit, which purpose requires that courts liberally construe the statute in favor of the consumer. Baker, 349 F.3d at 864.  This purpose is, in short, frustrated by using a Spot Delivery Agreement in the manner present here to rescind the terms of and undermine the disclosures made in the RISC.

        The Court is mindful of the fact that the Spot Delivery Agreement at issue in Patton allowed only the dealer to cancel the deal, and Defendant heavily relies on this fact to distinguish its case from the Patton case and to distinguish Patton from other

18

decisions finding that the use of a spot delivery agreement does not violate TILA.  However, Defendant overstates the <u>Patton</u> court's reliance on that fact.  The court did note that the unilateral cancellation right was "at least one significant factual difference" between the case presented in <u>Patton</u> and, for example, that present in <u>Janikowski</u>.  <u>Patton</u>, 608 F.Supp.2d at 914. However, the court then immediately and explicitly noted the relative value of that factual difference by stating, "More importantly, the court in <u>Janikowski</u> does not appear to have considered the specific arguments made by the Pattons here.  The Pattons' argument is that the Installment Contract disclosures were rendered illusory by the Purchase Spot Delivery Agreement." <u>Id</u>. These are, of course, the very arguments presented by Plaintiffs here.  Thus, while the <u>Patton</u> court noted the factual difference regarding the unilateral cancellation right, Defendants have portrayed the court as having relied on that difference to reach its opinion, a portrayal this Court finds misleading.

In any event, the Court finds that factual difference to be immaterial.  Indeed, in this context, the "power" of the consumer to cancel the deal based on the dealership's unwillingness to assign the contract or inability to securing financing from the "Lender" is, in effect, no power at all.  The consumer has no power to affect a lender's willingness to agree to the terms the consumer agreed to in the RISC.  And the consumer certainly has no power to

19

affect the dealership's willingness to assign the RISC with recourse or limited recourse. Indeed, the consumer may never even know whether it was the case that the lender refused to lend on the terms agreed to by the consumer and the dealership or whether the dealership refused to assign the contract with limited recourse, for example. In short, the consumer is not likely to be the one to cancel the RISC on the basis of the dealership's inability or unwillingness to provide the terms disclosed therein. And, in any event, the RISC provides that the consumer may not cancel the agreement for any reason, except for "legal cause," which failure of the dealership to secure financing is surely not, or if the dealership agrees. In sum, any notion that the consumer and the dealership are granted equal cancellation rights by the Spot Delivery Agreement is disingenuous, and, at a minimum, does nothing to change the fact that the use of the Spot Delivery Agreement to undermine the RISC violates the purpose of TILA. To the extent any of the cases cited by Defendant reached a conclusion that a bilateral cancellation right based exclusively on the dealer's ability to secure financing or willingness to assign the contract renders the use of a Spot Delivery Agreement permissible under TILA, the Court must respectfully disagree. See, e.g., Leguillou v. Lynch Ford, 2000 WL 198796 (N.D. Ill. 2000).

Defendant portrays this as a case involving two distinct contracts, RISC 1 and RISC 2, each of which fully complied with

20

TILA: Plaintiffs were not obligated to purchase the car on any terms other than those listed in RISC 1; and, upon Ford's cancellation of RISC 1, Plaintiffs then chose to become obligated to purchase the car on the terms disclosed in RISC 2. In a vacuum, this portrayal is attractive. Indeed, other courts have been persuaded by this approach. See, e.g., Leguillou, 2000 WL 198796. However, because the Spot Delivery Agreement vitiates the disclosures made in RISC 1 by rendering them illusory, the Court is not so persuaded. The use of the Spot Delivery Agreement in the manner presented here simply meant that RISC 1 did not comply with TILA because it creates a situation in which the consumer cannot know that the terms present in the RISC will actually be the terms of the deal, and the purpose of TILA cannot be satisfied by this uncertainty.

Under the circumstances present here, the Court finds that Defendant's use of the Spot Delivery Agreement to undermine or override the terms of the fully integrated RISC violates TILA's purpose. Summary judgment for Plaintiffs on the TILA claims is therefore appropriate.

**B. Equal Credit Opportunity Act**

The ECOA was originally enacted in 1974 to prohibit discrimination in credit transactions. Treadway v. Gateway Chevrolet Oldsmobile, Inc., 362 F.3d 971, 975 (7th Cir. 2004). Here, Plaintiffs do not allege discrimination but, instead, they

21

claim that Defendant violated the procedural notification requirements found in 15 U.S.C. § 1691(d) and the ECOA's implementing regulation, Regulation B, 12 C.F.R. § 202.9, because Defendant failed to provide an adverse action notice to Plaintiffs when J.P. Morgan refused to accept the assignment of RISC 1.

Here, Defendant did not issue a notice of adverse action when J.P. Morgan refused to finance the deal under the terms of RISC 1. Indeed, it is Defendant's practice to only issue a notice when it conducts a credit check on a consumer and, based on the outcome of that report, decides not to seek financing from a lender (doc. 54). However, Defendant contends that it is not required to have provided a notice because Plaintiffs accepted RISC 2, which, Defendant contends, was a counteroffer (Id., citing 12 C.F.R. § 202.9(a)(1)(iv), which provides that a creditor has 90 days within which to notify the applicant of a counteroffer "if the applicant does not expressly accept or use the credit offered"). In addition, Defendant contends that it is exempt from the notification requirements of the ECOA because it is not a "creditor" for notification purposes under the Act (Id.).

The Court need not reach the issue of whether Bay View's terms expressed in RISC 2 can be construed as a counteroffer to J.P. Morgan's terms expressed in RISC 1 because the Court finds that, under the circumstances present here, Defendant is not a creditor for notification purposes under the ECOA. On the

22

continuum of creditor functions, when a dealership acts as a liaison between consumers and lenders, referring credit applications to lenders, the dealership in that capacity is a creditor under the ECOA only with respect to the anti-discrimination and anti-discouragement provisions. See, e.g., 12 C.F.R. Pt. 202, Supp. I ("Where the automobile dealer only accepts applications for credit and refers those applications to another creditor who makes the credit decision...the dealer is subject only to §§ 202.4(a) and (b) for purposes of compliance with Regulation B."); Treadway, 362 F.3d at 979-80; Chastain, 2009 WL 1971621 at *7.

Plaintiffs insist that this interpretation of the regulation is "without legal basis," and that Ford here is a creditor because the RISC notes that it is a creditor (doc. 74). Of course, the regulation and the comment are clear on their face and provide the Court with sufficient "legal basis" for its decision here. In addition, Ford is a creditor for the purposes of TILA, which is undisputed here, and is identified as a creditor on the RISC, also undisputed, but this does not necessarily mean that it is a creditor for all purposes. Indeed, the regulation and comment explicitly contemplate a continuum of credit functions and note that some functions require compliance with requirements that other functions do not. The Court declines to accept Plaintiffs' one-size fits all concept of "creditor," especially when Plaintiffs

23

have provided no authority explicitly rejecting the regulation and comment. In their motion, response and reply, Plaintiffs have not pointed the Court to any facts in the record that would indicate that Ford itself set the terms of the loan or otherwise placed itself in a position on the creditor continuum that would subject it to the notification requirements. Therefore, the Court finds that, under this record and these circumstances, Ford was not required by the ECOA to provide notice to Plaintiffs and is thus entitled to summary judgment on Plaintiffs' ECOA claim.

### C. Ohio Consumer Sales Practices Act

The OCSPA provides in relevant part that "No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction." Ohio Rev. Code § 1345.02(A). When a supplier "[k]nowingly fail[s] to provide disclosures required under state and federal law" or "[k]nowingly provid[es] a disclosure that includes a material misrepresentation," such acts are "deceptive." Ohio Rev. Code § 1345.02(F).

Plaintiffs assert that Defendant violated the OCSPA "because the defendant had illegally reserved to itself the unilateral right to dishonor the plaintiffs' RISC in its entirety...but the plaintiffs were ignorant of the defendant's intentions" (doc. 63). Defendant asserts that it is entitled to summary judgment on the Ohio claim because it is derivative of the federal claims, which Defendant contends fail as a matter of law

24

(doc. 54).

The Court finds that Plaintiffs have pointed the Court to no evidence in the record that Defendant <u>knowingly</u> failed to provide disclosures required under TILA.  While the Court has found that Ford's use of the RISC and the Spot Delivery Agreement as presented here is violative of TILA, a knowing failure to abide by federal law cannot be inferred from such a finding.  This is especially true where other courts in the country have found that the use of a spot delivery agreement under similar circumstances does not violate TILA.  Defendant is therefore entitled to summary judgment on Plaintiffs' Ohio-law claim.

### D.  Actual Damages

TILA provides for different types of compensatory damages: actual damages under 15 U.S.C. § 1640(a)(1) and statutory damages under (a)(2)(A) for individuals and under (a)(2)(B) for class actions.  Actual damages are, of course, different from statutory damages and are available for "any actual damage sustained by [the] person as a result of the failure."  15 U.S.C. § 1640(a)(1).  Actual damages require a showing of detrimental reliance.  <u>United States v. Petroff-Kline</u>, 557 f.3d 285, 296 (6th Cir. 2009); <u>Vallies v. Sky Bank</u>, 591 F.3d 152, 157 (3d Cir. 2009); <u>Gold Country Lenders v. Smith</u>, 289 F.3d 1155, 1157 (9th Cir. 2002); <u>Turner v. Beneficial Corp.</u>, 242 F.3d 1023, 1028 (11th Cir. 2001)(en banc).  In order to prove detrimental reliance in this case,

Plaintiffs would have to show that they would either have received better terms elsewhere or would have not taken the RISC 2 loan but for the TILA violations of RISC 1.  See Petroff-Kline, 557 F.3d at 297.

Defendant contends that Plaintiffs have failed to plead and prove detrimental reliance here, and the Court agrees.  At the hearing, Plaintiffs asserted that their actual damages amount to the difference between the terms of RISC 1 and the terms of RISC 2. As Defendant noted at the hearing, however, the issue is not the amount of difference between the two contracts but whether Plaintiffs have shown detrimental reliance.  Plaintiffs have failed to adduce any evidence that they would have received terms elsewhere better than the terms offered in RISC 2, and Plaintiffs have not directed the Court to any evidence indicating that they would not have taken the loan on the RISC 2 terms but for the illusory nature of RISC 1.  On the contrary, Plaintiffs have entirely failed to respond to Defendant's motion for summary judgment on this point apart from their assertion at the hearing regarding the amount to which they feel entitled.

Consequently, the Court finds Defendant is entitled to summary judgment as to Plaintiffs' actual damages claim.

## IV. Conclusion

For the foregoing reasons, the Court DENIES Defendant's Motion for Summary Judgment as to Plaintiffs' TILA claim but GRANTS

26

it as to Plaintiffs' ECOA, OCSPA and actual damages claims (doc. 54) and GRANTS Plaintiffs' Motion for Summary Judgment as to Plaintiffs' TILA claim but DENIES it as to Plaintiffs' ECOA, OCSPA and actual damages claims (doc. 63).

The Court further SETS a hearing in order to determine the amount of the applicable statutory damages in this matter for October 7, 2010 at 2:00 P.M.

   SO ORDERED.

Dated: August 19, 2010      s/S. Arthur Spiegel
                            S. Arthur Spiegel
                            United States Senior District Judge